*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTONIO THIGPIN,

        Defendant-Appellant.

UNPUBLISHED
May 30, 2024

No. 344500
Wayne Circuit Court
LC No. 17-009799-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

AUJANAE ALLEN,

        Defendant-Appellant.

No. 346510
Wayne Circuit Court
LC No. 17-009799-02-FC

Before: GARRETT, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

This case involves the tragic death of five-week-old London Thigpin. At a joint trial with separate juries, the prosecution presented medical evidence showing severe and extensive internal and external injuries suffered by London and argued that these injuries were inflicted at the hands of London's parents, defendants Antonio Thigpin and Aujanae Allen. Following a 13-day trial, the juries convicted Thigpin of felony murder, MCL 750.316(1)(b), first-degree child abuse, MCL 750.136b(2), and second-degree child abuse, MCL 750.136b(3), and convicted Allen of second-degree murder, MCL 750.317, first-degree child abuse, and second-degree child abuse. Thigpin and Allen each moved for a new trial, arguing that their trial attorneys were ineffective for failing to consult with experts and/or failing to present expert testimony to rebut the prosecution's medical

-1-

evidence. The trial court held a *Ginther*[1] hearing across seven days, during which the court heard testimony from defendants' trial attorneys and multiple medical experts. The trial court ultimately denied defendants' motions for a new trial, concluding that neither trial attorney was ineffective.

Both defendants continue to challenge the performance of their trial attorneys on appeal. They also raise evidentiary, instructional, and confrontation challenges. Although errors were made at trial, none were so prejudicial as to warrant relief. In Docket No. 344500, we affirm Thigpin's convictions, but remand for the ministerial correction of his judgment of sentence, which states Thigpin was convicted of third-degree, rather than second-degree, child abuse. In Docket No. 346510, we affirm Allen's convictions and sentences.

## I. BACKGROUND

London was born on August 8, 2017 via a Cesarean section (C-section) without complications. She was fit and healthy, with high Apgar scores shortly after birth. Just over a month later, London was rushed to the hospital in cardiac arrest and was unresponsive. During the ambulance ride, Allen told Emergency Medical Technician (EMT) Christopher Coady that London was born prematurely and had an unknown heart condition. Neither was true. Among the many discovered injuries, London had extensive brain swelling, retinal and brain hemorrhages, and fractures to 13 ribs, her right arm (humerus), and her right leg (femur). Given the constellation of injuries suffered by London without any offered plausible explanation, doctors immediately suspected nonaccidental head trauma as a cause of the infant's unresponsiveness.

London passed away from a second cardiac arrest on September 16, 2017, after about 36 hours in care. An autopsy was performed by the medical examiner, Dr. Carl Schmidt, who concluded that London's death was caused by abusive head trauma (AHT), with shaking the likely mechanism of death. This diagnosis is often referred to as shaken baby syndrome (SBS). In the autopsy report and through his trial testimony, Dr. Schmidt described an extensive list of injuries: subdural hemorrhage, subarachnoid hemorrhage, right retinal hemorrhage, bilateral optic nerve sheath hemorrhage, hemorrhage in the dorsal nerve roots of the spine, 13 rib fractures (nine healing, two subacute, and two acute), right humerus fracture, right femur fracture, cerebral edema (brain swelling), bulging anterior fontanelle, subacute to chronic brain contusions, periventricular leukomalacia (death or damage to the inner white matter in the brain),[2] hypoxic ischemic encephalopathy (brain dysfunction from lack of oxygen or blood flow),[3] diffuse white matter

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] Children's Hospital of Philadelphia, *Periventricular Leukomalacia (PVL)*, available at <https://www.chop.edu/conditions-diseases/periventricular-leukomalacia-pvl> (accessed April 19, 2024).

[3] UCSF Benioff Children's Hospitals, *Neonatal Hypoxic Ischemic Encephalopathy*, available at <https://www.ucsfbenioffchildrens.org/conditions/neonatal-hypoxic-ischemic-encephalopathy> (accessed April 19, 2024).

gliosis (scarring in the brain that acts like a brain tumor),[4] bruises on three separate areas of the head, bruises on the left forearm, and lacerations on the left palm and fifth finger. The medical examiner ruled the manner of death as homicide.

Children's Protective Services (CPS) and the Detroit Police Department investigated London's injuries and death. Investigating officers interrogated Thigpin and Allen several times, both separately and together. Both defendants described that on the day of her first cardiac arrest, Allen had finished feeding London and asked Thigpin to change her diaper. When Thigpin approached London, he noted she did not appear to be breathing and was turning blue. The couple called 911 and began chest compressions. They initially denied that London had ever fallen or bumped her head. Several hours of the parties' video-recorded police interrogations were played for the jury. Thigpin eventually admitted that on September 13, three days before London's death, he and Allen had an argument that led to a literal tug-of-war with the baby. Thigpin grabbed London, but Allen continued to hold the baby's legs, and they pulled back and forth. Thigpin said he was pulling "so fast" and gripping London tightly, and her head was moving back and forth as they pulled. Allen let London go while Thigpin was pulling, and London's head hit Thigpin's shoulder "very hard." London was "screaming louder than she was when she wanted the bottle," but they did not observe any injuries. Thigpin also claimed that Allen dropped London off the couch several hours before her cardiac arrest. Allen asserted this fall from the couch happened two weeks earlier.

Based on the evidence gathered through the investigation, the prosecution charged defendants with felony murder, first-degree child abuse, and second-degree child abuse.

Before trial, Thigpin's attorney, Wyatt Harris, consulted with Dr. Marcus DeGraw, a child abuse pediatrician. Dr. DeGraw opined that London's head injuries were consistent with "several blunt force impacts to the face, forehead, and back of the head." London's brain contusions were subacute and "most likely occurred with the recent and significant head trauma that lead [sic] to the death of the child." Dr. DeGraw also concluded that the baby's acute and subacute rib, humerus, and femur fractures were "all indicative of recent trauma" and "highly concerning for inflicted injury." In sum, Dr. DeGraw felt that the constellation of injuries suffered by London was indicative of "repetitive inflicted trauma," i.e., repetitive abuse over a period of time, ultimately resulting in her death. Allen's attorney, Matthew Evans, did not consult a medical expert, focusing her defense on shifting the blame for London's injuries to Thigpin.

As noted, Thigpin and Allen were tried jointly but before separate juries. The prosecution's case against both defendants rested almost entirely on two bodies of evidence: medical evidence establishing that London suffered inflicted trauma, and evidence of defendants' statements made during video-recorded interrogations. Despite Dr. DeGraw's opinion clearly being unfavorable to Thigpin, Harris told the trial court outside the presence of the jury that he was "bring[ing] in Dr.

---

[4] Sylvester Comprehensive Cancer Center, University of Miami Health System, *Reactive Gliosis and Necrosis*, available at <https://umiamihealth.org/sylvester-comprehensive-cancer-center/brain-tumor-initiative/reactive-gliosis-andecrosis#:~:text=Gliosis%20occurs%20when %20your%20body,symptoms%20similar%20to%20brain%20tumors.> (accessed May 6, 2024).

DeGraw" to testify. That was the last on-the-record mention of Dr. DeGraw at trial, and he was never called to testify. Neither Thigpin nor Allen called any witnesses.

After the presentation of evidence in Thigpin's case, his attorney requested that the court instruct the jury on an accident defense for the murder charges. The trial court denied the motion, finding no record evidence to support the defense. The Thigpin jury subsequently deliberated for just over an hour before convicting Thigpin on all charges as noted above. The Allen jury similarly convicted Allen of child abuse but found her guilty of the lesser offense of second-degree murder instead of felony murder.

With the help of appellate counsel, Thigpin quickly appealed but both defendants also moved for new trials on the basis of ineffective assistance of counsel, arguing that their attorneys' failure to consult or, in Thigpin's case, call an expert witness to counter the prosecution's medical testimony was unreasonable. This Court remanded in *People v Thigpin*, unpublished order of the Court of Appeals, entered May 20, 2019 (Docket No. 344500), to allow a hearing.

At the *Ginther* hearing, defendants presented testimony from Oakland County Chief Medical Examiner Ljubisa Dragovic, who opined that London's brain and rib injuries could have resulted from trauma suffered during birth. Allen also sought to present Dr. Douglas Smith as an expert witness to testify that London's brain injuries were caused by "hypoxic brain injury at birth," the subdural bleeding resulted from a short fall from Allen's lap, the healing rib fractures occurred at birth or shortly after, and the tug-of-war incident caused the fractured humerus and femur and caused an existing subdural hematoma to rebleed. Dr. Smith agreed the cause of death was blunt-force trauma, but opined it was either accidental or natural. The court precluded Dr. Smith's testimony.

At the hearing, Dr. Theodore Graham, who delivered London, testified about the complication-free birth. Dr. Schmidt testified about his forensic examination of London after her death. Attorneys Evans and Harris testified regarding their trial strategies and decision-making processes. And attorney Wendy Barnwell testified to refute attorney Harris's claims about contacting her during his pretrial investigations.

The trial court ultimately denied defendants' motions for a new trial, concluding that both trial attorneys chose reasonable strategies and performed effectively. This appeal followed.

## II. ADMISSION OF EXPERT TESTIMONY

Both defendants challenge the trial court's preclusion of testimony from Dr. Smith at the *Ginther* hearing. Allen also challenges the trial court's preclusion of a scholarly article regarding the dating of nonaccidental rib fractures in infants.

## A. LEGAL PRINCIPLES

We review for an abuse of discretion a trial court's decision to admit or exclude evidence, including expert testimony. *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id*. at 217. While it is necessarily "an abuse of discretion

to admit evidence that is inadmissible as a matter of law," *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014), "[a] decision on a close evidentiary question ordinarily cannot be an abuse of discretion," *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Whether the exclusion of evidence denies a defendant's constitutional right to present a defense is a question of law we review de novo. See *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012).

At the time of the post-trial evidentiary hearing, MRE 702 provided:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[5]

"MRE 702 incorporates the standards of reliability that the United States Supreme Court established in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), in interpreting the equivalent federal rule of evidence." *People v Muhammad*, 326 Mich App 40, 51-52; 931 NW2d 20 (2018). Consistent with MRE 702, "an expert may not opine on matters outside his or her area of expertise." *Unger*, 278 Mich App at 251. The trial court's role is that of a gatekeeper, ensuring that "the proffered expert testimony is both relevant and reliable." *People v Bynum*, 496 Mich 610, 624; 852 NW2d 570 (2014).

## B. ANALYSIS

Dr. Smith possessed board certifications in anatomic and clinical pathology, and blood banking and transfusion medicine, but lacked expertise in forensic pathology and pediatric child abuse. Considering that the main issue disputed by defendants was Dr. Schmidt's cause and manner of death determinations, the type of "specialized knowledge" relevant to assisting the trial court's decision on the motions for new trial was that of another forensic pathologist[6] or, perhaps, a child abuse pediatrician. See MRE 702. The trial court reasonably determined that Dr. Smith was not qualified to offer an opinion on London's cause and manner of death. Moreover, as shown by their affidavits, Dr. Smith's opinion largely mirrored Dr. Dragovic's, and, for purposes of the *Ginther* hearing, Dr. Smith's testimony would have been cumulative, at best. Therefore, even if

---

[5] The Michigan Rules of Evidence were significantly amended with effective dates of January 1, March 27, and May 1, 2024. The *Ginther* hearing in this case was held in 2022, under the previous version of the rules.

[6] A forensic pathologist is board certified in anatomical and clinical pathology, but also completes a forensic pathology fellowship. See *Forensic Pathologist*, Cleveland Clinic, available at <https://my.clevelandclinic.org/health/articles/24614-forensic-pathologist> (accessed May 20, 2024).

erroneous, the exclusion of Dr. Smith's testimony was harmless. See *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

Allen additionally claims the trial court erred by excluding her proposed exhibit F from evidence at the *Ginther* hearing: a 2013 article about the dating of nonaccidental rib fractures in infants. The article aimed to "describe the sequential appearance of healing rib fractures on initial and follow-up radiographs using published guidelines in approximating the age of rib fractures in infants with the aim of establishing a more objective method of dating rib fractures by measuring the thickness of the callous formation." During the *Ginther* hearing, Allen's attorney attempted to impeach Dr. Schmidt's testimony about dating London's rib fractures with this journal article. The prosecution objected, and the trial court agreed that the article was not helpful.

The trial court did not abuse its discretion in this regard. Dr. Schmidt testified about his process for dating rib fractures:

> What we do is we take out the rib fractures and we put them in a decalcifying solution, and then we look through them, we cut them and we look at them under the microscope and to give us a rough idea of how old that rib fracture is.
>
> That's probably more accurate than looking and trying to assess from an X-ray how old that rib fracture is.

Dr. Schmidt used this process of dissection and microscopic examination to determine the stages of healing of London's various rib fractures. Allen's proposed journal article focused on a completely different process—the use of radiographs, specifically skeletal surveys, to assess callous formation and the healing process of rib fractures. Because Dr. Schmidt did not rely on radiological findings to date London's rib fractures, the radiology article was not relevant for impeachment purposes. See MRE 401 (evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). The trial court soundly exercised its discretion in excluding this material.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Both defendants contend the trial court erred in denying their motions for new trial based on ineffective assistance of counsel. In Docket No. 344500, we conclude that although the trial court erred by determining that Thigpin's trial attorney, Harris, performed effectively, the court correctly found a lack of prejudicial error. It is not reasonably probable that the jury would have acquitted Thigpin had it heard Dr. Dragovic's testimony that London's death stemmed from brain damage suffered at birth. Dr. Dragovic's theory was refuted by nearly all objective evidence in London's birth records and Dr. Graham's account, and could not reasonably account for the overwhelming evidence of inflicted physical abuse. In Docket No. 346510, we conclude that the trial court did not err by concluding that Allen received the effective assistance of counsel. Allen's trial attorney, Evans, made a reasonable decision to blame Thigpin for inflicting the injuries that killed London, and this decision rendered investigations into the validity of the prosecution's cause-of-death theory unnecessary. For these reasons, the trial court did not err by denying Thigpin's and Allen's motions for a new trial.

## A. LEGAL PRINCIPLES

"Whether the defendant received the effective assistance of counsel guaranteed him under the United States and Michigan Constitutions is a mixed question of fact and law." *People v Ackley*, 497 Mich 381, 388; 870 NW2d 858 (2015). "A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011) (quotation marks and citation omitted). This Court reviews for clear error the trial court's factual findings. *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008). "Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Armstrong*, 490 Mich at 289. To establish clear error, "a decision must strike as more than just maybe or probably wrong. . . ." *People v Cheatham*, 453 Mich 1, 30 n 23; 551 NW2d 355 (quotation marks and citation omitted). Questions of constitutional law are reviewed de novo, meaning that this Court reviews "the issues independently, with no required deference to the trial court." *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019).

The Michigan and United States Constitutions require that criminal defendants receive the assistance of counsel in their defense. Const 1963, art 1, § 20; US Const Am VI. "The right to counsel . . . is the right to the effective assistance of counsel." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016). "To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Id*. "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *People v Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019). This burden includes "overcom[ing] the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).

Generally, a defense attorney's decision whether to retain an expert witness is a matter of trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). "But a court cannot insulate the review of counsel's performance by calling it trial strategy; counsel's strategy must be sound, and the decisions as to it objectively reasonable." *Ackley*, 497 Mich at 388-389. As the United States Supreme Court explained in *Strickland v Washington*, 466 US 668, 690-691; 104 S Ct 2052; 80 L Ed 2d 674 (1984):

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.* In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. [Emphasis added.]

Defendants heavily cite the Michigan Supreme Court's decision in *Ackley* in support of their claims of ineffective assistance of counsel. In *Ackley*, 497 Mich at 391-392, the Court

recognized "the prominent controversy within the medical community regarding the reliability of SBS/AHT diagnoses." Leo Ackley was convicted of felony murder and first-degree child abuse after his girlfriend's three-year-old daughter died while in his care. *Id*. at 384. The prosecution's theory was that Ackley killed the child by blunt force trauma or shaking, while Ackley alleged that the child must have died as the result of an accidental fall. *Id*. At trial, the defense called no expert witnesses in support of its accidental-fall theory, while the prosecution presented five medical experts who testified that the child died as a result of AHT. *Id*. The Supreme Court concluded that Ackley's trial counsel performed deficiently "by failing to investigate and attempt to secure an expert witness who could both testify in support of [Ackley's] theory that the child's injuries were caused by an accidental fall and prepare counsel to counter the prosecution's expert medical testimony." *Id*. at 389. Although counsel had consulted one expert, Dr. Brian Hunter, that doctor was "a self-proclaimed *opponent* of the very defense theory counsel was to employ at trial." *Id*. at 391. And despite Dr. Hunter referring counsel to a different forensic pathologist who had conducted substantial research on short falls, counsel never contacted this individual or any other expert. *Id*. at 385-386. Counsel's unreasonable performance therefore resulted in "a defense theory without objective, expert testimonial support, and a defense counsel insufficiently equipped to challenge the prosecution's experts because he possessed only Dr. Hunter's reluctant and admittedly ill-suited input as his guide." *Id*. at 392.

But for counsel's deficient performance, the Court continued, there was a reasonable probability that the outcome of Ackley's trial would have differed. *Id*. at 394. The Court explained that Ackley's "conviction turned on the jury's assessment of the prosecution's cause-of-death theory, which was advanced through the testimony of five experts, each of whom concluded that the child's injuries were the result of some form of intentional abuse." *Id*. The lack of expert assistance for Ackley was critical, especially because "such expert assistance *was* available and would have provided the jury with another viable and impartial perspective on the facts of the case while contradicting the prosecution's theory of how the child died." *Id*. The Court explained that the prosecution's nonexpert evidence was not particularly strong and rejected this Court's suggestion that "the sheer volume of the prosecution's expert testimony" rendered efforts to respond to this testimony futile. *Id*. at 395-396. "This reasoning presumptively prioritizes quantity over quality, and takes no account of the comparative persuasiveness of the 'child abuse' and 'accidental fall' theories at issue in the case." *Id*. at 396. Because "expert testimony was not only integral to the prosecution's ability to supply a narrative of the defendant's guilt, [but] it was likewise integral to the defendant's ability to counter that narrative and supply his own," Ackley was entitled to a new trial. *Id*. at 397.

## B. THIGPIN'S CLAIM

Harris performed ineffectively because he did not conduct a reasonable investigation before landing on a last-minute trial strategy.

Harris consulted with Dr. DeGraw before trial regarding the medical evidence in this case. Harris offered confusing and conflicting testimony about how he was referred to Dr. DeGraw. While Harris was "not required to shop for experts until finding one who [would] offer favorable testimony," he "did no consultation at all beyond settling on the very first expert he encountered." *Ackley*, 497 Mich at 392. Moreover, Dr. DeGraw's letter revealed he shared Dr. Schmidt's belief that London suffered repeated inflicted injury. Dr. DeGraw opined London had suffered "several

blunt force impacts" to the head, her fractures were "highly concerning for inflicting injury," and the sum of the injuries was indicative of "repetitive inflicted trauma." Harris made no attempt to find another expert when Dr. DeGraw proved unhelpful.

Instead, Harris advised the court early in the trial that he would be calling Dr. DeGraw to testify in front of both juries. Harris's statement to the court can only mean one of two things: (1) Harris had not read Dr. DeGraw's report before trial and so still believed he would be a favorable witness, or (2) Harris had read the report but planned to call an unfavorable expert who would bolster the prosecution's theory of AHT. Neither of these can be considered sound trial strategy. Harris's testimony at the *Ginther* hearing that it was probably "trial strategy" to tell the court he expected Dr. DeGraw to testify, despite that being untrue, defies logic. Misleading the court is not trial strategy.

Thus, the record supports that Harris entered trial with no real strategy to defend Thigpin. Despite being armed with the information at least one week before trial that Dr. DeGraw would not viably support an alternative-injury defense, Harris seemed to press forward. Harris also conducted no research into SBS/AHT and "[c]ouldn't even begin to try to explain" these concepts. Not until closing arguments—because Harris waived and ultimately deferred his opening statement—was it known that Harris's defense strategy was to challenge the identity of the perpetrator, or at least a vague call to reasonable doubt because there was no evidence that Thigpin caused London's death or intended to kill her. Harris did not satisfy his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," leaving him unprepared for trial. *Strickland*, 466 US at 691. For this reason, Harris's performance fell below the objective standard of reasonableness.

In arguing that Harris simply followed the advice of an expert in the field and changed his strategy accordingly, the prosecution ignores Harris's on-the-record statements, which again establish that Harris entered trial without a sound strategy. The prosecution also emphasizes that Dr. DeGraw did not "suggest that any other reasonable expert would disagree with his conclusions," or refer Harris to another qualified expert, as in *Ackley*. But *Ackley* does not excuse defense attorneys from seeking out other experts unless the first consulted expert makes a referral. In other words, the reasonableness of counsel's performance does not turn on whether one expert refers counsel to another. The discussion in *Ackley* about Dr. Hunter's referral merely highlights how egregious it was for counsel not to consult any other expert, when the information was so readily available.[7]

Although Harris's performance was unreasonable, we are not persuaded there is a reasonable probability that but for counsel's deficient investigation, Thigpin's trial would have had a different outcome. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ackley*, 497 Mich at 389 (quotation marks and citation omitted). Three main points support the absence of prejudice. First, unlike in *Ackley*, there was significant

---

[7] Harris made other concerning decisions in this case—making no opening statement, offering little to no cross-examination, and calling no witnesses. Harris's actions were seemingly impacted by his desire to ensure that trial did not extend into his impending vacation, a topic discussed an unusual number of times throughout the trial.

-9-

corroborative evidence of physical abuse that could not be reasonably explained away. London's autopsy revealed more than a dozen rib fractures of varying ages and a broken right femur and humerus. As Dr. Jamie Bell, the pediatric intensivist who treated London, explained, a myriad of fractures in a five-week-old baby suggests child abuse because the baby virtually cannot move on its own. Dr. Dragovic could not explain London's arm and leg fractures, and as will be discussed, his explanation for the older rib fractures was implausible. SBS/AHT cases in which Michigan courts have found prejudice (whether because of ineffective assistance or another error) do not involve medical evidence of major corroborative signs of physical abuse like fractures. See, e.g., *Ackley*, 497 Mich at 388, 395, 395 n 7 (discussing head injuries and bruises but no fractures); *People v Roberts*, unpublished per curiam opinion of the Court of Appeals, issued June 6, 2017 (Docket No. 327296), pp 2-6 (discussing brain injuries but no bruises or fractures);[8] *People v Brown*, unpublished per curiam opinion of the Court of Appeals, issued July 25, 2019 (Docket No. 337860) (GLEICHER, J., concurring), p 1 (involving a fatal brain injury where "[t]he infant had no bruises or fractures"). Simply put, the physical evidence in this case was of a far greater magnitude than in other SBS/AHT cases with successful appeals.[9]

Second, the day before London became unresponsive, Thigpin admitted to pulling London away from Allen in a "violent tug," resulting in London's head "smash[ing] into his shoulder with a hard impact." Unlike in *Ackley*, 497 Mich at 395, where "the prosecution produced no witnesses who testified that the defendant was ever abusive," Thigpin's own admissions reasonably support that he intentionally committed physical abuse against London, or at a minimum, that he was reckless in the manner in which he handled the baby.

Third, taking account of the "comparative persuasiveness" of the "child abuse" and "birth trauma" theories, *Ackley*, 497 Mich at 396, it is not reasonably probable that presentation of Dr. Dragovic's testimony would have resulted in Thigpin's acquittal. Dr. Dragovic's theory is

---

[8] Unpublished opinions of this Court are not binding, MCR 7.215(C)(1), but may be considered as instructive or persuasive. *People v Jamison*, 292 Mich App 440, 445; 807 NW2d NW2d 427 (2011).

[9] Much of the criticism of SBS as a reliable diagnosis involves cases where the presence of the "triad" of symptoms—subdural hemorrhage, retinal hemorrhage, and brain swelling—was deemed conclusive of abuse, without any evidence of fractures or other corroborative physical evidence. See, e.g., Findley et al., *Feigned Consensus: Usurping the Law in Shaken Baby Syndrome/Abusive Head Trauma Prosecutions*, Wis L Rev 1211, 1222-1124 (2019). SBS detractors do not generally dispute that violently shaking a child can cause serious injury or death. See Findley et al., *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right*, 12 Hous J Health L & Pol'y 209, 213 (2012) ("Today, there is general agreement that child abuse was historically under-recognized and that abuse can produce subdural hemorrhage, retinal hemorrhage, and brain damage—the 'triad' of medical findings that has traditionally been used to confirm shaking or other forms of abuse. There is also general agreement that violently shaking a child is unacceptable and could cause serious injury or even death. At the same time, there is now widespread, if not universal, agreement that the presence of the triad alone—or its individual components—is not enough to diagnose abuse.") (footnotes omitted). In this case, of course, London's injuries entailed extensive external injuries and broken bones, far exceeding the so-called "triad."

undermined by the objective birth records, and had Dr. Dragovic testified at trial, the prosecution almost certainly would have called Dr. Graham to thoroughly rebut the birth-trauma theory. What Dr. Dragovic characterized as a "complicated" delivery and a "heroic attempt to salvage the fetus" was, by all objective accounts, a precautionary and successful C-section that resulted in a healthy birth. Birth records stated that the C-section procedure had "no complications." London was not born premature and had a strong Apgar score at birth. She exhibited no signs of distress upon birth or in the three days she was monitored at the hospital before discharge. On the day of discharge, London was observed with "normal" musculoskeletal findings—she had full range of motion, moved all her extremities, had good muscle tone, and her spine and clavicles were intact. London's neurological signs were also normal—she was active and alert, had a strong cry with normal pitch, and had soft and flat fontanelles.

Contrary to Dr. Dragovic's speculation, Dr. Graham—who performed Allen's C-section and delivered London—explained that London's ribs could not have been fractured during delivery. Had multiple ribs been fractured, London would have been in a great deal of pain and would have had a moan or whimper instead of a normal cry. And, as Dr. Schmidt explained, a child with rib fractures after birth would have difficulty breathing, which did not occur here. London also had full range of motion, which was inconsistent with several undiscovered fractures. According to Dr. Graham, London's brain bleeding and swelling could not have resulted from the delivery process. Had the brain injuries occurred at birth, London's fontanelles likely would have been bulging instead of soft and flat. Nothing in Dr. Dragovic's testimony could counter the birth records, which pointed to a healthy baby without birth complications.

Thigpin cannot establish the requisite prejudice from counsel's deficient performance. Therefore, the trial court did not err by denying Thigpin's motion for a new trial.

### C. ALLEN'S CLAIM

Allen's trial counsel, Evans, did not perform ineffectively because he made a reasonable decision to shift the blame to Thigpin. Evans explained that his trial strategy was not to challenge the cause and manner of death but instead to argue that any abuse was perpetrated by Thigpin. Evans's decision was primarily informed by three factors: (1) his experience in prior cases, (2) video of defendants' joint police interrogation, and (3) Allen's own statements to him.

First, Evans had experience litigating other child homicide cases and had handled well over 100 capital cases. He also had experience with Dr. Dragovic and had called him in another case that still led to a guilty verdict, even with facts that appeared better for the defendant than the facts of this case. Given the extent of London's injuries, Evans believed it would be better to focus the jury's attention on Thigpin's manipulation and culpability, rather than on the medical evidence and the "horrific" autopsy photos. As Evans recognized, the benefit of having separate juries to consider the evidence against each defendant allowed this shifting of the blame.

Second, Evans's strategic decision to blame Thigpin for the abuse—instead of arguing that the abuse simply did not occur—was informed by Evans's view of defendants' demeanor and statements during their recorded joint interrogation. Evans believed the jury would see that Thigpin was trying to minimize or cover up his actions. Evans's strategy was supported by the joint interrogation video during which Thigpin manipulated, interrogated, bullied, and blamed

Allen. Evans also had the benefit of Thigpin's admission to violently pulling London from Allen's arms. Evans argued during closing argument that Thigpin was abusive and controlling, making note of Allen's allegation of past abuse and stating that Thigpin kept Allen separated from her family and support network.

Third, Evans testified that Allen approved of his trial strategy to blame the abuse on Thigpin. Allen told Evans about her C-section, but never indicated that she had a difficult labor or that London suffered any injuries at birth. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 US at 491. Allen gave Evans no reason to think that London's birth was particularly complicated or anywhere near as difficult as Dr. Dragovic speculated. The trial court's conclusion that Evans had "no reason to think that this potential [birth injury] defense would be fruitful" was not erroneous. Crucially, when asked whether Allen specifically suggested that Thigpin "was responsible for the injuries to the victim," Evans testified that she had done so. *Strickland* is again instructive. Attorneys' strategic choices are often necessarily informed by information provided by the defendant. See *id*. at 491. "In particular, what investigation decisions are reasonable depends critically on such information." *Id*. Having been told (or suggested) by Allen that Thigpin caused London's injuries, Evans reasonably relied on that information in formulating his strategy not to challenge the prosecution's medical theory.

"[I]dentity is an element of every offense," *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008), and Evans reasonably hoped the jury would conclude that Thigpin, not Allen, committed the crime in this case. The decision to pursue this identity-based defense was risky but reasonable. See *People v Odom*, 276 Mich App 407, 415; 740 NW2d 557 (2007) ("Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases."). Evans's reasonable choice to challenge his client's identity as the perpetrator of the abuse rendered investigations into the cause and manner of London's death unnecessary. Thus, Evans satisfied his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 Mich at 691.

The trial court did not err by concluding that Evans performed effectively and by denying Allen's motion for a new trial on that basis.

## IV. INTERROGATOR COMMENTARY ON CREDIBILITY

Thigpin challenges the trial court's admission of an interrogating officer's statement— "Y'all full of shit"—during a recorded interview. At trial, Thigpin objected to the admission of three separate portions of the interrogation videos, including the portion containing the challenged statement. The trial court denied the motion to redact this statement.

Unfortunately, it appears that the videos as played for the jury no longer exist. The prosecution presented redacted versions of the recordings to this Court on the eve of oral argument. The time stamps mentioned on the record at trial, do not match the time stamps in the video recordings. Although the trial court did not redact the statement, "Y'all full of shit," the statement is never heard in the redacted videos provided by the prosecution to this Court. The defense insists

-12-

this statement remained in the video played to the jury, and the prosecution failed to satisfactorily explain why the videos presented to this Court do not seem to be the videos played before the jury. These are the prosecution's records and as the prosecution failed to properly preserve them, we proceed on the assumption that the statement was made.

We review for an abuse of discretion the trial court's evidentiary ruling. *Thorpe*, 504 Mich at 252. Under the rules of evidence, relevant evidence is generally admissible. MRE 402. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403.

Thigpin relies heavily on *People v Musser*, 494 Mich 337; 835 NW2d 319 (2013), to argue that the interrogator's comment was inadmissible. *Musser* involved allegations of child sexual abuse, in which detectives interrogating the defendant made repeated statements vouching for the complainant's credibility. *Id*. at 339-340. A video recording of Musser's interrogation was played for the jury. *Id*. at 345. The Supreme Court granted leave to appeal to consider "whether out-of-court statements made by police investigators during an interrogation of a defendant that vouch for the credibility of another must be redacted from a recording of the interview before it is played for the jury." *Id*. at 339. The Court held that "where the proponent of the evidence offers an interrogator's out-of-court statements that comment on a person's credibility for the purpose of providing context to a defendant's statements, the interrogator's statements are only admissible to the extent that the proponent of the evidence establishes that the interrogator's statements are relevant to their proffered purpose." *Id*. at 353-354. Even if the statements are relevant, they remain subject to exclusion under MRE 403. *Id*. at 354. In making this determination of relevance, the Court cautioned that "a mechanical recitation by a party that an interrogator's statements are necessary to provide 'context' for a defendant's responses without explaining how the statements relate to the recited purpose is insufficient to present the interrogator's statements to the jury." *Id*. at 354-355.

The facts of *Musser* are far afield from those present here. As documented at length in *Musser*, *id*. at 343-345, the interrogating detectives made repeated statements which effectively vouched for the credibility of the minor complainant, including that "[k]ids have a hard time lying about this stuff," *id*. at 343. The *Musser* Court concluded that most of the detectives' comments were irrelevant to providing context to the defendant's statements and could have been redacted without harming the probative value of the defendant's responses. *Id*. at 359-362.

In this case, the officer's statement, "Y'all full of shit," did not vouch for anyone's credibility, but suggested that Thigpin *lacked* credibility and truthfulness. Thus, assuming *Musser* applies to these facts, the officer's statement was only admissible if it was relevant to giving context to Thigpin's response, and if its probative value was not substantially outweighed by the risk of unfair prejudice. See *id*. at 353-354. Thigpin has not told us how he responded to the officer's statement and we cannot answer this question from the videos as provided to this Court. We will proceed on the assumption that the statement was admitted in error.

Even assuming the admission of the statement was improper, Thigpin is not entitled to relief. A nonconstitutional, preserved evidentiary error "is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative." *Id*. at 348 (quotation marks and citation omitted). "An error is outcome determinative if it undermined the reliability of the verdict and, in making this determination, a court should focus on the nature of the error in light of the weight and strength of the untainted evidence." *Id*. (quotation marks and citation omitted). The claimed error here involves four words uttered by a police officer during a lengthy interrogation. The officer's statement was never emphasized during the prosecution's arguments. Considering that the jury watched *hours* of untainted video footage of Thigpin being interrogated by police officers, both alone and with Allen, and recognizing that the strongest evidence in this case was the untainted medical testimony, this error did not undermine the reliability of the verdict.

## V. ACCIDENT INSTRUCTION

Thigpin contends the trial court erred in denying his request for a jury instruction regarding accident.

## A. PRESERVATION

The prosecution contends Thigpin failed to preserve this issue because defense counsel made a "pie-in-the-sky, hopeful request," but "ultimately did not object to the trial court's decision" not to give the requested instruction and later approved the jury instructions without objection. However, "[t]he purpose of the appellate preservation requirements is to induce litigants to do what they can in the trial court to prevent error and eliminate its prejudice, or to create a record of the error and its prejudice." *People v Mayfield*, 221 Mich App 656, 660; 562 NW2d 272 (1997). Thigpin preserved his challenge by requesting and arguing for an instruction on accident. Once the trial court denied the instruction, Thigpin was not required to continually renew his futile objection each time the issue arose. See *People v Stevens*, 498 Mich 162, 180 n 6; 869 NW2d 233 (2015). Thus, counsel's eventual expression of satisfaction with the jury instructions did not negate counsel's prior request for an accident instruction.

## B. LEGAL PRINCIPLES

"Claims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). "[I]f an applicable instruction was not given, the defendant bears the burden of establishing that the trial court's failure to give the requested instruction resulted in a miscarriage of justice." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). "The defendant's conviction will not be reversed unless, after examining the nature of the error in light of the weight and strength of the untainted evidence, it affirmatively appears that it is more probable than not that the error was outcome determinative." *Id*. at 124-125.

A criminal defendant is "entitled to have a properly instructed jury consider the evidence against him or her." *Dobek*, 274 Mich App at 82. Jury instructions must therefore "include all the elements of the charged offense, and must not exclude material issues, defenses, or theories if the

evidence supports them." *People v Kosik*, 303 Mich App 146, 155; 841 NW2d 906 (2013). Additionally, "[a] defendant asserting an affirmative defense must produce some evidence on all elements of the defense before the trial court is required to instruct the jury regarding the affirmative defense." *People v Guajardo*, 300 Mich App 26, 34-35; 832 NW2d 409 (2013). An affirmative defense does not negate the elements of a crime but rather "seeks to justify, excuse, or mitigate it." *People v Aspy*, 292 Mich App 36, 49; 808 NW2d 569 (2011) (quotation marks and citation omitted). When reviewing a claim of instructional error, we examine "the instructions as a whole, rather than piecemeal, to determine whether any error occurred." *People v Kowalski*, 489 Mich 488, 501; 803 NW2d 200 (2011).

## C.  ANALYSIS

Thigpin's attorney requested a jury instruction on the defense of accident under M Crim JI 7.2 for the felony murder and second-degree murder charges, and under M Crim JI 7.3a for the first-degree child abuse charge.  M Crim JI 7.2 provides:

> (1) The defendant says that [he/she] is not guilty of ___ ___ because _____'s death was accidental.  By this defendant means that [he/she] did not mean to kill or did not realize that what [he/she] did would probably cause a death or cause great bodily harm.

> (2) If the defendant did not mean to kill, or did not realize that what [he/she] did would probably cause a death or cause great bodily harm, then [he/she] is not guilty of murder.

M Crim JI 7.3a states:

> The defendant says that [he/she] is not guilty of [*state crime*] because [he/she] did not intend to [*state specific intent required*].  The defendant says that [his/her] conduct was accidental.  If the defendant did not intend to [*state specific intent required*], [he/she] is not guilty.  The prosecutor must prove beyond a reasonable doubt that the defendant intended to [*state specific intent required*].

Because Thigpin presented no evidence in his defense, and there must be "some evidence" to support the reading of an instruction, the evidence in this case could only come during the prosecution's case-in-chief.  Thigpin argues that his video statements, together with testimony by the prosecution's experts that London's head injuries could have resulted from a short fall off the couch or a short drop, provided sufficient evidence to support the affirmative defense instruction.

The only admission of an act by Thigpin involves the "tug-of-war" during which he violently pulled the baby from Allen.  Thigpin does not point to any particular statements in the interrogations which show that he did not realize that grabbing the baby in this manner would likely cause great bodily harm.  Thigpin told detectives that the tug-of-war incident occurred during an argument with Allen and when he ultimately overtook Allen in a "violent tug," "the baby's head smashed into his shoulder with a hard impact."  In part because Thigpin presented no evidence in his defense, the jury heard no evidence that this tug-of-war incident was an accident. Thigpin admitted to no other acts, such as dropping the child, for which he could plausibly claim

-15-

an accident. As such, Thigpin did not produce "some evidence" to support the defense of accident, and the trial court did not abuse its discretion by failing to instruct the jury on this defense.[10]

## VI. THIGPIN'S ADOPTION OF ALLEN'S STATEMENT

Thigpin challenges the admission against him of a statement made by Allen regarding London's medical history. Specifically, EMT Coady testified that in the ambulance on the way to the hospital from their home, he inquired about London's medical history. Allen responded that London had an unknown heart condition and had been born premature. Coady testified the male individual was "listening intently" and "nodding his head," but said nothing.

### A. HEARSAY

As noted, "[a] trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *Thorpe*, 504 Mich at 251. But whether the admission of evidence violates a defendant's confrontation right presents a question of constitutional law that we review de novo. See *People v Nunley*, 491 Mich 686, 696-697; 821 NW2d 642 (2012).

"Hearsay" is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). In this context, a "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." MRE 801(a). Statements which are not hearsay include adoptive admissions. MRE 801(d)(2). A statement constitutes an adoptive admission if "[t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth." MRE 801(d)(2)(B). This Court need not determine whether Thigpin, through his nonverbal conduct, "manifested an adoption or belief in [the] truth" of Allen's statement to the EMT because the statement was not hearsay. The prosecution did not introduce Allen's statement to prove the truth of the matter asserted but rather for the opposite purpose—to show that Allen *lied* about London's medical history to the EMT. In other words, Allen's statement was not offered to establish that London, in fact, had a heart condition and was born premature. The rules against hearsay are therefore not implicated.[11]

### B. CONFRONTATION CLAUSE

Thigpin's confrontation argument equally lacks merit. The Confrontation Clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" US Const, Am VI. See also Const 1963, art 1, § 20. The confrontation right "is implicated only for 'testimonial' evidence, because the Confrontation Clause applies to 'witnesses' against the accused—in other words, those who

---

[10] Indeed, Allen's trial counsel specifically declined to request an accident instruction, stating: "I don't see any evidence of accident."

[11] Even if Allen's statement constituted hearsay, the statement likely would have been admitted under MRE 803(4)'s exception for "[s]tatements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history."

'bear testimony.' " *People v Bruner*, 501 Mich 220, 227; 912 NW2d 514 (2018), quoting *Crawford v Washington*, 541 US 36, 51; 124 S Ct 1354; 158 L Ed 2d 177 (2004). "Statements are testimonial if the 'primary purpose' of the statements or the questioning that elicits them 'is to establish or prove past events potentially relevant to later criminal prosecution.' " *People v Garland*, 286 Mich App 1, 10; 777 NW2d 732 (2009), quoting *Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006). But when the objective circumstances show that the primary purpose of questioning is to "meet an ongoing emergency," the resulting statements are nontestimonial. *Davis*, 547 US at 822. The United States Supreme Court has reiterated that the analysis is objective:

> The circumstances in which an encounter occurs—e.g., at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards—are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred. [*Michigan v Bryant*, 562 US 344, 360; 131 S Ct 1143; 179 L Ed 2d 93 (2011).]

Although the "primary purpose" caselaw is most often applied to police interviews or interrogations, the United States Supreme Court and this Court have applied its holding outside this context. In *Davis*, 547 US at 828, the Supreme Court held that a domestic violence victim's statements to a 911 operator were nontestimonial because the circumstances of the operator's questioning "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." In *People v Spangler*, 285 Mich App 136, 154; 774 NW2d 702 (2009), this Court applied the "primary purpose" test to questioning by a sexual assault nurse examiner (SANE), holding:

> [I]n order to determine whether a sexual abuse victim's statements to a SANE are testimonial, the reviewing court must consider the totality of the circumstances of the victim's statements and decide whether the circumstances objectively indicated that the statements would be available for use in a later prosecution or that the primary purpose of the SANE's questioning was to establish past events potentially relevant to a later prosecution rather than to meet an ongoing emergency. [*Id.*]

In this case, Allen's statement to Coady was clearly nontestimonial in nature because the primary purpose of Coady's question about London's medical history was to meet an ongoing emergency. When Coady asked the question, Allen was in the back of an ambulance while paramedics were attempting to revive an unresponsive London. The reason for this question was to assist in determining the proper medical care for London and to pass along accurate medical information about London to doctors at the hospital. That is, the objective circumstances leave no doubt that the primary purpose of Coady's question was to meet an ongoing medical emergency, not to "establish or prove past events potentially relevant to later criminal prosecution." *Garland*, 286 Mich App at 10 (quotation marks and citation omitted). Coady was asking a standard question during a medical emergency that any paramedic would ask a parent in those circumstances. Because Allen's statement was nontestimonial, Thigpin's confrontation right did not apply. For

-17-

these reasons, the trial court did not err by admitting Allen's statement to Coady as evidence against Thigpin.

## VII. THIGPIN'S JUDGMENT OF SENTENCE

Although not raised by the parties, we note there is a scrivener's error in Thigpin's judgment of sentence. Thigpin was convicted of and sentenced for one count each of first-degree and second-degree child abuse in violation of MCL 750.136b(2) and (3). While his judgment of sentence cites the correct statutory subsections, it mistakenly states Thigpin was convicted of third-degree, rather than second-degree, child abuse. We remand for the ministerial correction of Thigpin's judgment of sentence.

In Docket No. 344500, we affirm Thigpin's convictions but remand for the ministerial correction of his judgment of sentence. We do not retain jurisdiction. In Docket No. 346510, we affirm Allen's convictions and sentences.

/s/ Kristina Robinson Garrett
/s/ Deborah A. Servitto
/s/ James Robert Redford

-18-